IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. SAG-21-0272 |
| | * | |
| | * | |
| COREY GARDNER | * | |

\*\*\*\*\*\*\*

**<u>MEMORANDUM OPINION</u>**

On July 21, 2021, a grand jury returned an indictment against Corey Gardner charging six counts arising out of the discovery of firearms and narcotics in his vehicle on two separate occasions: March 18, 2020 in Baltimore City, Maryland and May 13, 2021 in Howard County, Maryland. ECF 1. During the investigation of the second incident, Mr. Gardner's residence was also searched, resulting in the seizure of another firearm, additional narcotics, and more than $54,000. Mr. Gardner has filed two motions, and several accompanying memoranda, seeking to suppress the physical evidence seized from his cars and home. ECF 15 (with memoranda 15-1 and 15-2), 57. This Court has considered those motions, the related briefing (ECF 47, 61), and the evidence presented and arguments made by counsel at two evidentiary hearings held on September 19, 2022 and October 19, 2022. For the reasons that follow, Mr. Gardner's motions will be denied.

I.  BALTIMORE CITY INCIDENT

A. Factual Background

On March 18, 2020, an investigating detective conducting covert surveillance, Detective Villafane, observed Mr. Gardner and a woman engaging in suspected narcotics transactions. While observing their actions, the detective saw Mr. Gardner leave the block where the transactions were occurring, walk in the general direction of S. Payson Street, and return with a

black bag, which the detective believed to contain a new supply of narcotics.  Detective Villafane subsequently directed the arrest team to arrest Mr. Gardner and the woman.

Officer body camera footage is available for the remainder of the incident, beginning with the arrest of Mr. Gardner.  During that arrest, the officers recovered money, four cell phones, and a Lexus key fob from Mr. Gardner's person.  One detective, Detective Healy, took the key fob and walked in the direction of S. Payson Street, clicking the buttons to see if Mr. Gardner's vehicle could be identified.  A Lexus vehicle responded in the 600 block of S. Payson Street.  The officers called for a K-9 unit, which arrived on the scene.  Loki, a drug detection dog, exited the K-9 unit, and his handler asked another officer on the scene to tap the Lexus with Loki's "reward toy" to focus him on the vehicle.  After the toy had been hidden from sight, Loki conducted a scan of the vehicle.  Loki circled the vehicle three times, and during the second circuit around the car he stopped to sniff the driver's side door intently, changed his breathing, snapped his head, and wagged his tail.  Loki's handler, Officer Bradshaw, who is trained to note these types of changes in Loki's behavior as a positive alert, directed the officers to the spot Loki had identified.  The officers then conducted a warrantless search of the vehicle, in fact discovering four gelcaps of narcotics in the driver's side door pocket where Loki alerted, along with a loaded firearm.

**B. Analysis**

Mr. Gardner challenges (1) the validity of Loki's alert to his vehicle and (2) the use of the Lexus key fob recovered from his pocket to identify his vehicle in the first instance.[1]

---

[1] Mr. Gardner made a few additional less-developed arguments about this stop, such as suggesting that Detective Villafane's representation "we have you on video" is problematic and that there was another person on the scene of the recovery of narcotics near the female arrestee who may have been responsible.  Those arguments are more appropriate for trial than in the context of this hearing, as they have no bearing on the constitutional issues presented.  Mr. Gardner also questioned the credibility of the officer who recovered the narcotics from the car door, suggesting that the gelcaps were not shown on video.  This Court disagrees with the suggestion that the

1. **K-9 Search**

Regarding Loki, the basis for Mr. Gardner's challenge is threefold: (1) Loki's track record, (2) the use of Loki's toy in the sweep of the vehicle; and (3) the indicia used to classify Loki's response as an "alert."

"Probable cause to conduct a search based on a drug-detection dog's alert exists when the totality of the circumstances, 'viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.'" *United States v. Green*, 740 F.3d 275, 282 (4th Cir. 2014) (quoting *Florida v. Harris*, 568 U.S. 237, 248 (2013)). In *Harris*, the Supreme Court addressed how courts should determine if a drug-detection dog's alert is sufficiently reliable to constitute probable cause. The Court held that the preferred measure of a dog's reliability is its performance in controlled testing environments, and that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246. In other words, evidence of a dog's satisfactory training or certification enables a court to "presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 247.

Here, the uncontroverted evidence is that Loki was certified at the time of this incident. However, the presumption of reliability for certified drug-detection dogs can be rebutted. For example, a defendant my challenge "the adequacy of the drug-detection certification or training program or examin[e] how the dog or handler performed in the program." *Green*, 740 F.3d at 282

---

officer's credibility is in question. There is no requirement that the narcotics be separately videoed or photographed on the body worn camera, and this Court agrees with the officer that the video footage indicates his placement of the gelcaps in the evidence envelope, even if each item is not individually displayed on camera.

(citing *Harris*, 568 U.S. at 247). Evidence of the K-9's or handler's previous performance in the field may also "sometimes be relevant." *Harris*, 568 U.S. at 247. However, courts have generally been reluctant to find that a dog's questionable field performance can override the presumption created by certification. In *Green*, for example, the Fourth Circuit found that a K-9 search was sufficiently reliable, despite the dog's 43 percent field success rate, where the government presented "extensive" unrefuted evidence of a dog's reliable performance in training and certification programs. 740 F.3d at 283-84. In addition, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Harris*, 568 U.S. at 247.

While Mr. Gardner made a series of unsupported assertions in his briefing about Loki's performance at training, no such evidence materialized at the hearing. Instead, the only training-related evidence came from Loki's handler, Officer Bradshaw, who explained that other than some expected missteps early in the training process, Loki has been certified, completes training twice a month, has never failed a training, and passed his annual certification exam in May 2020 without missing or making a false detection. *See* ECF 47 at 7. Thus, there is no evidence of unreliable performance during training, or any other facts, to undermine the presumption of reliability attendant to Loki's valid certification.

Mr. Gardner's next argument is that the search of the vehicle was compromised by the fact that another officer, at Officer Bradshaw's request, rubbed a dog toy on the driver's side of Mr. Gardner's vehicle prior to the search. The Bodycam Video confirms that Officer Bradshaw did recruit another officer to use the dog toy to entice Loki to perform the scan, and that the officer rubbed the toy along the side of the car. *See* ECF 48 (hereinafter, "Bodycam Video"), 16:48:15-16:49:55. When Officer Bradshaw hands the toy to the officer, she tells him "Take it, let [Loki]

4

see it, he'll see it. Then smack it up against car." *Id.* at 16:48:30-16:48:42. Officer Bradshaw then explains that this action "keys him up on the car," and that "he knows that [the toy] is his reward." *Id*. After Officer Bradshaw removes Loki from the K-9 vehicle, the officer rubs the toy along the entire driver's side of the vehicle, including the area near the driver's side window where Loki eventually "alerts," then pretends to throw the toy away. *Id.* at 16:49:40-16:49:55. Mr. Gardner claims that this rubbing of the toy on the car "chang[ed] the composition of the car," and "facilitated the alert" on the driver's side door. ECF 15-1 at 4.

The circumstances of this case do not suggest that the officers intended to use the toy improperly to draw an alert from Loki, or that Loki's alert was caused by the toy. First, the video suggests that none of the officers, other than Officer Bradshaw, had interacted meaningfully with Loki prior to this incident. Officer Bradshaw did not instruct the other officer to rub the toy along the car, but just to "smack it" against the car at some unspecified spot. Bodycam Video at 16:48:30-16:48:35. The officer appears to have made his own decision to rub the toy along almost the entire driver's side of the vehicle. Second, if the "scent" of the toy somehow altered the composition of the car, the alteration would have affected the entire driver's side, not just the spot Loki identified. Loki did not alert to the other areas of the car where the toy had been rubbed by the officer. He only alerted to the door containing narcotics.

Finally, Mr. Gardner claims that Loki's conduct "was not distinctive enough to signify an alert" on the driver's side door. ECF 15-1 at 4. During the roughly two-minute search, Loki circles the car three times but does not bark, sit, or lie down. *See* Bodycam Video at 16:50:00-16:52:10. However, on two occasions, Loki does appear to briefly stop and intently sniff an area on the driver's side door near the rearview mirror. During his first trip around the car, Loki merely stops and sniffs this area for roughly a second. Bodycam Video at 16:50:07. Then, during his second

revolution around the car, Loki stops again at the driver's side door, stops breathing heavily, sniffs, and jumps up on the door. *Id.* at 16:50:50. After returning Loki to the patrol car, Officer Bradshaw immediately walks back to the Lexus, points at the driver's side door, and says: "Whatever it is, it's over here. He didn't sit, but it's over here. . . . You could see where he was keeping the nose." *Id.* at 16:52:25-16:52:40.

Officer Bradshaw testified that Loki makes an alert in one of two ways: (1) by sitting or (2) by demonstrating other changes in behavior, which for Loki include a change in breathing patterns, head snap, tail wagging, and sometimes scratching. She is trained to recognize those changes. Even an untrained observer, however, can see from the video that Loki's behavior changed at the area of the car where Officer Bradshaw indicated he had alerted. Thus, the evidence sufficiently substantiates Loki's alert, giving the officers probable cause for the warrantless search of the vehicle.

This Court notes that, alternatively, the smell of marijuana emanating from the vehicle may have provided probable cause for a warrantless search regardless of Loki's actions. *United States v. Lewis*, 606 F.3d 193, 198 (4th Cir. 2010) (holding that an officer who smells marijuana emanating from a vehicle has probable cause to search that vehicle). However, because the Government did not introduce officer testimony at the hearing regarding the smell, the only evidence is from officer statements recorded on the body camera footage. *See* Bodycam Video at 16:52:40. Because the parties have not addressed whether those statements properly fall under any hearsay exceptions, this Court does not rely on the marijuana smell in upholding the validity of the search.

### 2. Key Fob

With respect to the key fob, Mr. Gardner argues that it should not have been seized because it was not contraband, and that the police needed to obtain a search warrant before using the key fob to locate his vehicle. As always in a Fourth Amendment context, this Court must assess the reasonableness of the officers' actions. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness' . . . ."). That assessment requires balancing "the degree to which [the search] intrudes upon an individual's privacy" and "the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999).

First, the seizure of the key fob as part of a lawful search incident to arrest, *see United States v. Robinson*, 414 U.S. 218, 235 (1973), was reasonable under the circumstances. The officers had observed Mr. Gardner leaving the scene of his narcotics dealing on foot and returning relatively quickly with what they suspected was a new supply of merchandise. The officers thus reasonably believed, upon discovery of the key fob, that Mr. Gardner had been keeping his stash in a nearby car. They therefore had "probable cause to associate the property with criminal activity." *Texas v. Brown,* 460 U.S. 730, 741-42 (1983) (quoting *Payton v. New York*, 445 U.S. 573, 580 (1980)).

As to the officers' subsequent use of the key fob to identify the car, a person has, at best, a "diminished expectation of privacy" in the identity of his vehicle. *See United States v. Knotts,* 460 U.S. 276, 281 (1983) (noting general "diminished expectation of privacy in an automobile"); *United States v. Cowan,* 674 F.3d 947, 955-57 (8th Cir. 2012) (holding that a defendant lacked a reasonable expectation of privacy in the identity of his car, meaning that the use of a lawfully seized key fob to identify the vehicle did not violate the Fourth Amendment). Here, Mr. Gardner's

vehicle was parked on a public street in plain view, within walking distance of his drug trafficking activity.  The officers could have identified the vehicle as Mr. Gardner's by other means, such as surveilling him when he left the block.  Given the minimal expectation of privacy in the identity of his vehicle parked in public view, and the comparative government interest in identifying a readily mobile object suspected of being used to store narcotics, the officers' use of the key fob in this instance did not offend the Fourth Amendment.  *See Cowen,* 674 F.3d at 955-57; *United States v. Dasinger*, 650 F. App'x 664, 671-72 (11th Cir. 2016) (unpublished) (holding that the use of a key fob to locate a defendant's car was reasonable because any supposed privacy interest in the car's identity "was outweighed by the officers' legitimate interest in investigating the signs of criminal activity").

## II. HOWARD COUNTY INCIDENT

### A. Background

The Howard County Police Department ("HCPD") received information that Mr. Gardner was an armed narcotics trafficker residing in an apartment in Howard County.  They decided to stake out the area around his apartment complex, intending to conduct a vehicle stop if they saw him commit a traffic violation. On May 13, 2021, a surveilling officer saw Mr. Gardner drive out of the parking area of his apartment complex at a high rate of speed, running a stop sign without stopping.  The surveilling officer notified patrol officers stationed nearby, who initiated a traffic stop at a gas station at 1:15 p.m.  They requested a K-9 unit, also stationed nearby, at 1:16 p.m.  In the meantime, they began to process Mr. Gardner for the traffic violation.  Because he did not have a driver's license on his person, the officers asked him to write down his name and identifying information, and they began running the information through various databases.  The K-9 unit arrived at 1:25 p.m., and Mr. Gardner was handcuffed while the dog scan occurred.  The K-9

alerted to the presence of narcotics at 1:32 p.m.  A subsequent search of the vehicle resulted in the recovery of a loaded firearm and 100 plastic containers of cocaine.

In the meantime, another officer spoke to the leasing office at Mr. Gardner's apartment complex. The complex representative provided Mr. Gardner's unit number and informed the officer that they had received a complaint about drug activity in the unit.  Based on that additional information and the contraband seized from the traffic stop, HCPD sought and obtained a search warrant for the apartment, leading to the recovery of another firearm, more cocaine, and a significant amount of cash.

**B. Analysis**

**1. Vehicle Stop**

Mr. Gardner challenges the Howard County stop on two primary bases: (1) that the decision to stop his car on a pretextual basis, for the purpose of hoping to search it, was unlawful; and (2) that the traffic stop was impermissibly prolonged by the K-9 scan.[2]  Neither argument is persuasive.

To satisfy the Fourth Amendment, a traffic stop "'must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'" *United States v. Wilson*, 205 F.3d 720, 723 (4th Cir. 2000) (en banc) (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993)).  Probable cause to believe the suspect committed a traffic violation is sufficient to conduct a traffic stop—no matter how minor the offense. *See Hassan El*, 5 F.3d at

---

[2] In his briefing and at the hearing, Mr. Gardner made some other undeveloped assertions, such as suggesting that the dog's "alleged 'alert' is deficient just as indicated in the Baltimore City search." ECF 15-1 at 10.  At the hearing, he suggested that the dog could have been responding to other odors instead of responding to the narcotics in the vehicle, such as if a customer at the gas station had dropped a blunt on the ground.  He offered no expert or factual testimony in support of any of these theories, including in his cross-examination of the dog's handler.  This Court will not address these arguments further.

9

730; *Whren v. United States*, 517 U.S. 806, 810 (1996). "Moreover, an officer who observes a traffic offense may have probable cause even where he has additional motives for the stop." *United States v. Williams*, 740 F.3d 308, 312 (4th Cir. 2014); *see also Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). In other words, a pretextual stop is lawful as long as the officer actually observes a traffic offense. All that matters is whether "the officer 'had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense.'" *United States v. Sowards*, 690 F.3d 583, 588 (4th Cir. 2012) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Mr. Gardner does not argue that officers lacked probable cause to pull him over, after an officer personally witnessed him running a stop sign in violation of Md. Code Ann., Transp. § 21-403(c)(1). Rather, he simply asserts that the stop was pre-planned and pretextual. As noted above, pretext does not undermine the constitutionality of an otherwise lawful stop in this instance.

Turning to the duration of the traffic stop, once a valid traffic stop has occurred, the officers' actions during the stop must be "reasonably related in the scope of circumstances that justified the stop." *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (citing *Terry v. Ohio*, 392 U.S. 1, 29 (1968)). This requirement "is satisfied when the seizure is limited to the length of time reasonably necessary to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *Id.* "A police officer can extend the duration of a routine traffic stop only if the driver gives consent or if there is reasonable suspicion that an illegal activity is occurring." *Id.*

No additional reasonable suspicion is necessary to conduct a K-9 scan during a valid traffic stop. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). However, K-9 scans conducted without

probable cause violate the Fourth Amendment if they extend a traffic stop beyond the time necessary to conduct the "ordinary inquiries incident to such a stop." *Id.* at 408; *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). These ordinary inquiries include "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022) (quotation omitted). Because the maximum permissible length of a routine traffic stop "cannot be stated with mathematical precision," the appropriate inquiry is in such cases is "whether the detention lasted longer than was necessary, given [the traffic stop's] purpose." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008).

Applying this principle, the Fourth Circuit recently upheld the district court's denial of a motion to suppress where fifteen minutes elapsed between a valid traffic stop and the arrival of a K-9 unit. *See Perez*, 30 F.4th at 372, 376. In justifying this delay, the court noted that the officers were investigating multiple potential traffic violations by the driver, and further that the violations necessitated the officers calling a tow truck (which had not yet arrived by the time the K-9 unit showed up). *Id.* at 376. It then concluded that the officers were "diligent enough to pass constitutional muster," noting that "though the stop could have been shorter (and begun more efficiently), it wasn't impermissibly prolonged." *Id.* at 376-77.

The Fourth Circuit has also upheld other traffic stops of similar length—though in each case, it engaged in a fact-specific analysis based on the circumstances of the stop and the testimony of the relevant parties. In *United States v. Hill*, for example, the court found permissible a 20-minute stop where officers were investigating a driver's and passenger's licenses and wrote two summonses before a K-9 unit arrived. 852 F.3d 377, 383-84 (4th Cir. 2017). The court noted that

11

"[o]fficers are not required to estimate with 'mathematical precision' the duration of each discrete task undertaken during a traffic stop," and concluded that "none of the officers' individual actions suggested a lack of diligence in pursuing the stop or were otherwise unreasonable." *Id.* at 383-84. And in *Green*, the Fourth Circuit declined to suppress evidence from a dog detection scan where fourteen minutes elapsed between the initial stop and the dog's alert. 740 F.3d at 281.

In this case, the Government offers the following timeline of the traffic stop:

- 1:15 p.m. – Mr. Gardner is pulled over.

- 1:16 p.m. – Because he cannot produce a driver's license, Mr. Gardner is asked by the patrol officer to write his name and date of birth on a piece of paper. While the officer conducts "the administrative tasks of the traffic stop," he also requests that the K-9 unit respond to the scene.

- 1:25 p.m. – The K-9 unit arrives. By this time, the patrol officer had not yet issued Mr. Gardner a traffic citation. The officer, who was aware of Mr. Gardner's criminal history and prior arrests, asks Mr. Gardner to exit the car and places him in handcuffs. Mr. Gardner is uncooperative with that process.

- 1:32 p.m. – The K-9 alerts to the presence of drugs in the car.

Thus, it appears ten minutes elapsed between the traffic stop and the arrival of the K-9 unit, and 17 minutes elapsed between the initiation of the traffic stop and the K-9's alert. Based on this account, the government asserts that the patrol officer's actions did not impermissibly prolong the stop. The officer's uncontroverted testimony at the hearing was that a standard traffic stop lasts between 15-18 minutes, so the duration of this stop, from initiation through the K-9 alert, falls within that range. Additionally, there were complicating factors with this stop that extended its duration to some extent—having to run Mr. Gardner through law enforcement databases without the benefit of his driver's license,[3] the fact that Mr. Gardner "became combative" when asked to

---

[3] Mr. Gardner suggests that the officers already knew his identity because of their narcotics investigation and that he offered to share a photo of his driver's license. He has not adduced

put his hands behinds his back to be handcuffed for the K-9 scan, and the presence of bystanders videoing the incident. Even with those complicating factors not attributable to the patrol officer's actions, the duration of this traffic stop remained within the norm. Thus, there was no unreasonable delay associated with the K-9 involvement in this constitutionally permissible traffic stop.

### 2. Search Warrant

Finally, Mr. Gardner argues that the items recovered from his apartment must be suppressed because the "illegal" traffic stop comprised the probable cause for the issuance of the search warrant. ECF 15-1 at 7. As this Court finds the traffic stop and subsequent search of Mr. Gardner's vehicle to have been constitutional, there is no basis to invalidate the warrant. Therefore, this Court need not consider the Government's alternative argument that, even assuming HCPD lacked probable cause to search the apartment, the evidence seized from there should be admitted pursuant to the good faith exception described in *United States v. Leon*, 468 U.S. 897 (1984).

## III. CONCLUSION

For the reasons stated herein, Mr. Gardner's motions, ECF 15 and 57, are DENIED. A separate order accompanies this Memorandum Opinion.

Dated:  October 27, 2022                                               /s/
                                                                  Stephanie A. Gallagher
                                                                  United States District Judge

---

evidence, though, that either of those circumstances would warrant the officers deviating from their normal practices during a traffic stop for a driver who does not produce a valid license.